# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

NATIONAL FREIGHT, INC.,
               Plaintiff,

vs.

ANDREW P. SIDAMON-ERISTOFF,
in his capacity as Treasurer of the State
of New Jersey; STEVEN R. HARRIS, in
his capacity as Administrator,
Unclaimed Property Administration of
the State of New Jersey Department of
Treasury; and ROBERT H.
DAVIDSON, in his capacity as Chief,
Unclaimed Property Administration of
the State of New Jersey Department of
Treasury,
               Defendants.

Civil Action No.

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF NATIONAL FREIGHT, INC.'S MOTION FOR PRELIMINARY INJUNCTION

---

REED SMITH LLP
Diane Green-Kelly, Esq.
(*pro hac vice* pending)
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
(312) 207-1000
dgreenkelly@reedsmith.com

REED SMITH LLP
Kellie A. Lavery, Esq.
Princeton Forrestal Village
136 Main Street - Suite 250
Princeton, NJ 08540-7839
(609) 524-2071
klavery@reedsmith.com

Attorneys for Plaintiff
National Freight, Inc.

## **TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ....................................................1

II.  RELEVANT FACTS AND PROCEDURAL HISTORY ...............................5

The Parties .....................................................................5

Unclaimed Property Audit:  Disbursements..................................5

Unclaimed Property Audit:  Credits .......................................8

III. LEGAL ARGUMENT.........................................................12

A.   The Standard For Preliminary Injunctive Relief. ...............12

B.   Plaintiff Has A Reasonable Probability Of Success On The Merits...................................................................13

   1.   The Assessments Violate The Federal Common Law Established By The U.S. Supreme Court Governing The States' Respective Rights To Escheat  Intangible Property. ..................................................13

   2.   The Interstate Commerce Commission Termination Act of 1995 Preempts The UPA And Bars Enforcement Of The Credits Assessment. .................................19

   3.   The Assessments Violate The Commerce Clause. .................29

   4.   The Assessments Violate New Jersey's Unclaimed Property Law.........................................................31

C.   Plaintiff Has Established That It Will Be Irreparably Harmed If Preliminary Injunctive Relief Does Not Issue....................35

D.   A Balancing Of The Harms Favors Granting A Preliminary Injunction..............................................................37

E.   Preliminary Injunctive Relief Is In The Public Interest ....................38

IV.  CONCLUSION..............................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Freedom Forge Corp.,*
204 F.3d 475 (3d Cir. 2000)....................................................................... 35

*Am. Civil Liberties Union v. Ashcroft,*
322 F.3d 240 (3d Cir. 2003)....................................................................... 38

*Am. Petrofina Co. of Texas v. Nance,*
859 F.2d 840 (10th Cir. 1988) ................................................................... 17

*American Express Travel Related Services Inc. v. Sidamon-Eristoff,*
755 F.Supp. 2d at 608 (D.N.J. 2011) ........................................................ 17

*Bennington Foods LLC v. St. Croix Renaissance Group, LLP,*
528 F.3d 176 (3d Cir. 2008).......................................................................13

*Bowen v. Bowen,*
473 A.2d 73 (N.J. 1984)..............................................................................33

*Boyle v. United Techs Corp.,*
487 U.S. 500 (1988).....................................................................................13

*CapogrOsso v. Supreme Court of New Jersey,*
588 F.3d 180 (3d Cir. 2009)........................................................................36

*Christianson v. County of King,*
239 U.S. 356 (1915)....................................................................................14

*Curry v. McCanless,*
307 U.S. 357 (1939)....................................................................................15

*Delaware v. New York,*
507 U.S. 490 (1993)..............................................................................14, 16

*Edelman v. Jordan,*
415 U.S. 651 (1974)....................................................................................36

*Estin v. Estin,*
334 U.S. 541 (1948)....................................................................................14

*Grafton & Upton R.R. Co. v. Town of Milford,*
    337 F.Supp. 2d 233 (D. Mass. 2004) ................................................................. 19

*Highmark, Inc. v. UPMC Health Plan, Inc.,*
    276 F.3d 160 (3d Cir. 2001).............................................................................. 13

*ICU Investigations, Inc. v. Simonik Moving & Storage, Inc.,*
    2009 WL 2475225 (N.J. Super. App. Div. Aug. 14, 2009)................... 19, 26, 27

*Illinois Corporate Travel, Inc. v. American Airlines, Inc.,*
    889 F.2d 751 (7th Cir. 1989) .............................................................................. 24

*Kassel v. Consolidated Freightways Corp. of Delaware,*
    450 U.S. 662 (1981)............................................................................................ 29

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992)....................................................................................... *passim*

*N. J. Retail Merchants Ass'n. v. Sidamon-Eristoff,*
    669 F.3d 374 (3d Cir. 2012)........................................................................ *passim*

*New England Legal Found. v. Mass. Port Authority,*
    883 F.2d 157 (5th Cir. 1989) .............................................................................. 23

*New Jersey v. Chubb,*
    570 A.2d 1313 (N.J. Super. 1989) ...................................................................... 33

*Oburn v. Shapp,*
    521 F.2d 142 (3d Cir. 1975)................................................................................ 13

*Old Bridge Chems., Inc. v. N.J. Dept. of Envtl. Protection,*
    965 F.2d 1287 (3d. Cir. 1992)............................................................................. 29

*Pennsylvania v. New York,*
    407 U.S. 206 (1972)............................................................................................ 14

*Rowe v. N.H. Motor Transport Ass'n,*
    552 U.S. 364 (2008)..................................................................................... *passim*

*Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.,*
    869 F.Supp. 278 (D.N.J. 1994) .......................................................................... 27

*Southco, Inc. v. Kanebridge Corp.*,
 324 F.3d 190 (2003), *rev'd en banc on other grounds*, 390 F.3d
 276 (3d Cir. 2004) ......................................................................... 37

*Standard Oil Co. v. New Jersey*,
 341 U.S. 428 (1951) ................................................................. 14, 15

*Statland v. Amer. Airlines, Inc.*,
 998 F.2d 539 (7th Cir. 1993) ............................................. 23, 24, 28

*Telebrands Direct Response Corp. v. Ovations Communications, Inc.*,
 802 F.Supp 1169 (D.N.J. 1992) ..................................................... 37

*Texas v. New Jersey*,
 379 U.S. 674 (1963) ........................................................... 14, 16, 32

*UPS, Inc. v. Flores-Galarza*,
 318 F.3d 323 (1st Cir. 2003) ............................................. 22, 28, 30

*Vail v. Pan Am Corp.*,
 616 A.2d 523 (N.J. Sup. Ct. 1992) ................................................. 24

*Western Union Telegraph Co. v. Pennsylvania*,
 368 U.S. 71 (1961) ......................................................................... 15

*Witty v. Delta Air Lines, Inc.*,
 366 F.3d 380 (5th Cir. 2004) ................................................... 21, 22

**Statutes**

U.S. Const. art. 1, § 8, cl. 3 ............................................................ 29

U.S. Const. art. VI, cl. 2 ................................................................. 13

28 U.S.C. § 2201 ............................................................................... 1

28 U.S.C. § 2202 ............................................................................... 1

42 U.S.C. § 1983 ............................................................................... 1

45 U.S.C. §§ 801-856 ..................................................................... 19

49 U.S.C. §§ 701-727 ..................................................................... 20

49 U.S.C. §§ 1301-1557 ................................................................. 19

49 U.S.C. § 1305(a)(1) ................................................................. 20

49 U.S.C. §§ 10101-16106 ........................................................... 20

49 U.S.C. § 14501 ....................................................................... 19

49 U.S.C. § 14501(c)(1) ...................................................... 2, 19, 20

49 U.S.C. § 41713 ....................................................................... 19

49 U.S.C. § 41713(b)(4)(A) ........................................................ 20

Ariz. Rev. Stat. § 44-301.15 ....................................................... 17

765 Ill. Comp. Stat. § 1025/2a .................................................... 17

Ind. Code § 32-34-1-1(e) ............................................................ 17

Interstate Commerce Commission Termination Act of 1995, Pub. L.
  No. 104-88, 109 Stat. 803 ......................................................... 1

Md. Code Ann. Com. Law § 17-101(m)(3) ................................. 17

Md. Code Ann. Com. Law § 17-101(m)(4) ................................. 17

N.J.S.A. § 46:30B .................................................................... 31

N.J.S.A. § 46:30B-1 .................................................................. 1

N.J.S.A. § 46:30B-49 .............................................................. 31

N.J.S.A. § 46:30B-50 .............................................................. 28

N.J.S.A. § 46:30B-89 .............................................................. 33

N.J.S.A. § 46:30B-91 .............................................................. 31

N.J.S.A. § 46:30B-94 ......................................................... *passim*

N.J.S.A. § 46:30B-95 ......................................................... *passim*

N.J.S.A. § 46:30B-103 ...................................................... 11, 35

Ohio Rev. Code Ann. § 169.01(B)(2)(b) ................................................................. 17

Tenn. Code Ann. § 66-29-104(3)(C) ..................................................................... 17

Va. Code Ann. § 55-210.8:1.B................................................................................ 17

**Rules**

Fed. R. Civ. P. 65(a)................................................................................................. 12

**Other Authorities**

*Black's Law Dictionary* 1158 (5th ed. 1979)......................................................... 21

Houghton, et al., *Unclaimed Property*, 74-3 C.P.S. at A-5, § II.B.1.
    (BNA 2014)...................................................................................................... 15,18

New Jersey Law Revision Commission, Final Report relating to
    Uniform Unclaimed Property Act (June 1998)............................................... 31,32

Select USA, *Logistics and Transportation Industry in the United
    States*, available at http://selectusa.commerce.gov/industry-
    snapshots .......................................................................................................... 30

Uniform Unclaimed Property Act § 20(f) cmt (1995)............................................ 33

## I.    **PRELIMINARY STATEMENT**

On May 27, 2015, Plaintiff National Freight, Inc. ("NFI" or "Plaintiff") filed its Verified Complaint For Equitable, Declaratory, And Injunctive Relief (the "Complaint") against the following individuals, solely in their official capacities: Andrew P. Siamon-Eristoff, Treasurer of the State of New Jersey (the "State"), Steven R. Harris, Administrator of the Unclaimed Property Administration of the Department of Treasury, and Robert H. Davidson, Chief of the Unclaimed Property Administration (collectively "Defendants").    Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to enjoin Defendants from enforcing monetary assessments against Plaintiff, including interest and penalties, purportedly made pursuant to the New Jersey Unclaimed Property Act, N.J.S.A. §46:30B-1, *et. seq.* (the "UPA"), because enforcement would violate federal common law governing escheats, the Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (codified in scattered sections of subtitle IV of title 49 of the United States Code) (the "ICCA"), the Commerce Clause of the U.S. Constitution, and the UPA.    Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff seeks a declaratory judgment and injunctive relief.

Plaintiff submits this brief in support of its concurrently filed application to enjoin the State of New Jersey and each of the Defendants from enforcing the assessments against Plaintiff, including interest and penalties because Defendants

1

demand that Plaintiff pay the assessments by June 1, 2015 or be subject to significant penalties in the form of interest at the rate of 10% above the 52-week U.S. Treasury bill rate and have refused to extend the deadline.  In addition, Plaintiff may be subject to enforcement action by Defendants.  If Plaintiff pays the assessment, it will be unable to recover if the Court rules in Plaintiff's favor on the merits of its claims because of sovereign immunity.

As discussed below, Plaintiff has established that it is entitled to a preliminary injunction.  Plaintiff has established that it is likely to succeed on the merits of each of its claims because, *inter alia*, Defendants are demanding that Plaintiff escheat to New Jersey property that other states, not New Jersey, have jurisdiction to claim under federal common law, which preempts the UPA. Further, Defendants are demanding that Plaintiff escheat customer credits arising from transactions involving the transportation of property by a motor carrier in violation of the broad preemption provision of the ICCA, which provides that "a State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).   The Supreme Court has interpreted that statute broadly and repeatedly held that state laws or claims are preempted, even if the effect on rates, routes or service is indirect.  The Supreme Court has held that any such claims or state law that would increase a motor carrier's cost of doing business and thus

potentially require it to increase prices to defray the cost of compliance is preempted.  Enforcement of the assessments here would require Plaintiff to send a notice by certified mail to hundreds of customers and subject Plaintiff to increased administration costs to comply with the UPA and potentially the escheat laws of 50 states, the District of Columbia and territories (such as Puerto Rico) with their differing requirements, reporting deadlines and added due diligence burdens which likely would be drayed by increased prices.

Plaintiff also has established a likelihood of success on the merits of its claim that Defendants' enforcement of the assessments would violate the Commerce Clause.  The Commerce Clause permits Congress to legislate when it perceives that the national welfare is not furthered by independent state action. When Congress has determined to preempt a field, as it has with the ICCA and federal common law, state regulation is barred regardless of the public good it purports to serve.   Defendants' enforcement of the UPA against Plaintiff with respect to customer credits in violation of the ICCA preemption provisions and federal common law places a burden on interstate commerce potentially affecting millions of dollars in spending and is contrary to the ICCA's well-recognized purpose of deregulating motor carriers.

Finally, Plaintiff has established a likelihood of success on the merits of its claims that enforcement of Defendants' assessments violates the UPA.  Defendants

3

have assessed a penalty for failure to retain records for 1991, even though the applicable provision of the UPA does not authorize Defendants to do so for years prior to 1992 under the circumstances here.  For subsequent years, the UPA authorizes a penalty for failure to retain records calculated as an estimate of unclaimed property that "should have been but was not reported" based on "any available records." N.J.S.A. § 46:30B-94.  Instead Defendants calculated penalties by estimating unclaimed property that should *not* have been reported to New Jersey and some was not reportable at all; in addition, Defendants completely disregarded Plaintiff's available records for multiple years.   In addition, Defendants unlawfully charged interest on the penalties.

As discussed below, Plaintiff has demonstrated that it will suffer irreparable harm in the absence of a preliminary injunction.  If it pays the amounts Defendants demand, the Eleventh Amendment to the U.S. Constitution will deprive Plaintiff of the ability to assert a claim to recover amounts this Court would declare to be illegal.  On the other hand, if Plaintiff fails to make payment, it will be subject to enforcement actions by Defendants, as well as significant penalties in the form of high rates of interest.  The balance of harms favors Plaintiff and a preliminary injunction is in the public interest, because Defendants lack any interest in enforcing an illegal assessment.

For these reasons, as well as those set forth below, Plaintiff is entitled to the entry of a preliminary injunction enjoining enforcement of the assessments.

## II.   RELEVANT FACTS AND PROCEDURAL HISTORY

### The Parties

Plaintiff is a private, family owned corporation located in New Jersey, which offers transportation logistics to customers throughout the United States.   Plaintiff is a motor carrier that is governed by the ICCA.   Defendants Andrew P. Siamon-Eristoff ("Treasurer"), the Treasurer of the State of New Jersey (the "State"), Steven R. Harris ("Administrator"), the Administrator of the Unclaimed Property Administration of the Department of Treasury, and Robert H. Davidson ("Chief"), the Chief of the Unclaimed Property Administration, are responsible for the administration and enforcement of the UPA.

### Unclaimed Property Audit:  Disbursements

In November 2010, the Chief notified Plaintiff that it would be subject to an audit "to ascertain whether the liability of the Company and its subsidiaries to the State under the New Jersey Unclaimed Property Law has been accurately and completely stated . . .."   The audit covered report periods 1996-2010 -- *i.e.*, transaction years 1995-2010 for payroll disbursements and transaction years 1991-2007 for all other property.

First, the State auditor reviewed voluminous records related to Plaintiff's disbursements accounts, specifically payroll disbursements, operating disbursements, broker payroll, and small insurance claims. On July 24, 2013, the State auditor issued an audit report and assessed a liability related to purported unclaimed disbursements in the amount of $328,983.12 plus $145,305.59 of interest, demanding payment by August 24, 2013.

Plaintiff made a partial payment of $187,543.78, in part because the Chief insisted and in part to stop interest from continuing to run, and submitted written objections to various portions of the audit report, some of which were sustained. The Chief reduced the Disbursements Assessment by $86,951.54 to $242,031.58, but increased interest to $258,515.70 (for a total of $500,547.28). The $242,031.58 assessment was comprised of: (a) $93,150.00 in penalties pursuant to N.J.S.A. § 46:30B-94 for failure to maintain records (for the period 1995-September 1997 for payroll disbursements and 1991-1998 for all other disbursements); (b) $ 127,461.73 for unclaimed property of owners with an address in New Jersey, no address or a foreign address for periods for which Plaintiff had records (October 1997-2010 for payroll and 1999-2010 for all other disbursements); (c) $21,225.56 in unclaimed property where the owner had an address in another state that exempted the property from the reporting requirement pursuant to a business-to-business ("B2B") exemption for non-payroll

6

disbursements for the period 1999-2010; (d) $194.29 for property where the owner had an address in a state where the dormancy period is tolled during a continuing business relationship; and (e) $258,515.70 in interest on all of the foregoing.

Pursuant to N.J.S.A. § 46:30B-94, the penalty of $93,150.00 was to be calculated as a reasonable estimate of unclaimed property that should have been but was not reported for the years for which Plaintiff failed to retain address records and otherwise lacked records sufficient to permit the preparation of a report. N.J.S.A. § 46:30B-94. Instead of basing the penalty on unclaimed property New Jersey could claim under federal common law (*i.e.*, property where the owner's address was in New Jersey or Plaintiff lacked an address), Defendants calculated the penalty by also extrapolating unclaimed disbursements where the owners had addresses in other states, including states that exempted such property from the reporting requirement under a B2B exemption and states where the dormancy period had not expired under statutes that tolled the dormancy period during a continuing business relationship. Defendants also calculated a penalty for 1991, even though based on pre-amendment § 46:30B-95 (which was applicable to 1991), § 46:30B-94 does not authorize Defendants to assess an estimation penalty for that year. *See* L. 1989, c. 58, s 1 (amended by L. 2002, c. 35, s 62, eff. July 1, 2002) and N.J. Stat. Ann. § 46:30B-94, L. 1989, c. 58, s 1 (amended by L. 2002, c. 35, s 62, eff. July 1, 2002).

7

On April 2, 2014, Plaintiff made a payment to the State in the amount of $90,809.87. Having learned that the Chief had unilaterally applied $80,497.92 of the $187,543.78 partial payment made in August 2014 to interest instead of liability to stop interest from running, Plaintiff expressly directed the State to apply the entire $90,809.87 payment only to the uncontested portion of the liability and not interest. As a result, the unpaid amount in dispute for the Disbursements Assessment consists of (a) $22,765.00 related to the portion of the penalty related to 1991; (b) $21,419.85 of property where the owner's address is in a state with a B2B exemption; (c) $194.29 of property with an address in a state where the property was not yet dormant under a dormancy tolling provision; and (d) interest.

In addition, the State auditor assessed $293,245.94 of unclaimed disbursements (the "Other States Disbursement Assessment") for the period 1997-2010 where the owner had an address in a state other than New Jersey and demanded that Plaintiff turn it over to New Jersey, even though some of those states exempted the property from the reporting requirement and some did not consider the credits to be "abandoned" as a matter of law, pursuant to dormancy tolling provisions.

**Unclaimed Property Audit: Credits**

Next, the State auditor reviewed Plaintiff's records of customer credits. On April 30, 2015, the State issued an audit report (the "Credits Audit Report") for

purported unclaimed customer credits for the period 1990 to July 30, 2007 and demanded payment in the amount of $1,954,506.31 by June 1, 2015 (hereinafter, the "Credits Assessment").

In reviewing credits, the auditor distinguished between two types of credits. The first were "overcharges," which were coded as "UR" transactions, that the auditor agreed were not subject to escheat reporting. The second, which according to the State auditor were escheatable, were credits resulting from the inability to match a customer payment to an open invoice, and were coded as "P" credits. P credits result from, for example, customers making payment based on their record of contracted tariff rates, bill of lading, and other shipping-related documentation even before Plaintiff mails an invoice. In addition, P credits arise because loads are not entered into Plaintiff's system but the customer pays based on delivery, or incorrect reference numbers are entered into Plaintiff's system and the customer pays by their reference number rather than Plaintiff's invoice number.

For the period 2006-2010, Plaintiff's books and records segregated the credits into URs and Ps by state of the customer's address. The State auditor assessed a liability for unclaimed P credits for that period to customers with addresses in New Jersey, foreign countries, or lacking an address in the amount of $17,510.81; and assessed $18,566.34 for P credits to customers with addresses in

other states whose escheat statutes expressly exempt from the reporting requirement credits arising in B2B transactions.

For the period 1999-2005, Plaintiff had records of credits by state of the customer's address. But because the records did not segregate the credits by URs and Ps, the auditor disregarded Plaintiff's records for that period entirely and assessed a penalty in the amount of $794,862.00 pursuant to § 46:30B-94 of the UPA for failure to retain records. The State auditor disregarded Plaintiff's records for the period 1999-2005, even though Plaintiff had address records for that period, a condition which precluded Defendants from assessing a penalty under § 46:30B-94. Even if § 46:30B-94 had applied, however, if rather than disregard Plaintiff's credits records for the period 1999-2005, Defendants had allocated the credits for 1999-2005 between URs and Ps with reference to the allocation of such credits for the period 2006-2010, the penalty for 1999-2005 would have been reduced by $710,712.00 plus interest.

When calculating the penalty for that period, the State auditor extrapolated P credits for the period 2006-2010. However, instead of extrapolating credits New Jersey could potentially claim under federal common law (*i.e.*, credits to customers with addresses in New Jersey or Plaintiff lacked an address), Defendants extrapolated P credits related to all customers, including customers with addresses in other states, states that exempt such credits under B2B exemptions, and/or states

that toll the dormancy period when there is a continuing business relationship, even though such property is not property that should have been reported to New Jersey or at all.

Plaintiff did not have records for the period 1991-1998.  Therefore, the State auditor calculated a penalty pursuant to § 46:30B-94 for that period in the amount of $576,738.00 by extrapolating P credit data from the period 2006-2010. However, the P credits that the State auditor extrapolated were not limited to credits to customers with addresses in New Jersey or where Plaintiff lacked an address, but also included credits to customers with addresses in other states, including states that exempt such credits under B2B exemptions and where a dormancy period was tolled and had not expired during a continuing business relationship.  As a result, Plaintiff was overcharged by $534,360.00 plus interest.

In addition, Defendants calculated a penalty for P credits for 1991, even though the applicable statute did not authorize Defendants to do so for that year and the applicable statute of limitation for enforcement of the UPA against Plaintiff had expired.  The State auditor not only assessed interest on purported unreported unclaimed property, but also on penalties calculated pursuant to § 46:30B-94, even though § 46:30B-103 authorizes an assessment of interest only on the value of unclaimed property, not on penalties.

11

Per the Credit Audit Report, "if the property is not remitted to the State by" June 1, 2015, "NFI will be assessed a statutory rate of interest at 10% above the 52-week U.S. Treasury bill rate in effect on the original date the property should have been paid or delivered."   On May 27, 2015, Plaintiff filed a Verified Complaint for a declaratory judgment and injunctive relief.  Plaintiff now files its Motion for a Preliminary Injunction and this memorandum in support thereof.

## III.   LEGAL ARGUMENT

### A.   The Standard For Preliminary Injunctive Relief.

Plaintiff seeks a preliminary injunction pursuant to Fed. R. Civ. Proc. 65(a), enjoining Defendants from enforcing the Disbursements Assessment, the Other States Disbursements Assessment, and the Credit Assessment, including interest and penalties (collectively, the "Assessments").   A court considers four factors when determining whether to grant a preliminary injunction: "'(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest.'"  *N. J. Retail Merchants Ass'n. v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (citation omitted) (entering a preliminary injunction against enforcement of an

amendment to the UPA).  As demonstrated below, Plaintiff has satisfied each of these requirements and, thus, is entitled to the entry of a preliminary injunction.

### B.      Plaintiff Has A Reasonable Probability Of Success On The Merits.

A party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." *Bennington Foods LLC v. St. Croix Renaissance Group, LLP*, 528 F.3d 176, 179 (3d Cir. 2008).  "It is not necessary that the moving party's right to a final decision after trial be wholly without doubt." *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975).  Rather, "the plaintiff need only prove a *prima facie* case, not a certainty that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001).

### 1.      The Assessments Violate The Federal Common Law Established By The U.S. Supreme Court Governing The States' Respective Rights To Escheat  Intangible Property.

The Supremacy Clause provides that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2.  "It is undisputed that state law can be preempted by federal common law as well as federal statutes." *N.J. Retail Merchants Ass'n,* 669 F.3d at 392 (citing *Boyle v. United Techs Corp.*, 487 U.S. 500, 518 (1988) (enjoining an amendment to New Jersey's escheat law because it

violated and was preempted by federal common law).   Enforcement of large portions of the Assessments, including all of the Other States Disbursements Assessment, would violate the common law established in *Texas v. New Jersey*, 379 U.S. 674 (1963) and affirmed in, *Pennsylvania v. New York*, 407 U.S. 206 (1972) and *Delaware v. New York*, 507 U.S. 490 (1993) (collectively, the "*Texas Cases*").

The right of states as sovereigns to take custody of abandoned personal property has been clearly established.  *See Delaware*, 507 U.S. at 497 (citing *Christianson v. County of King*, 239 U.S. 356 (1915)).   When the abandoned property is tangible, the State in which the property is located may claim the property by escheat.  *Id*. at 498.  But intangible property "is not physical matter which can be located on a map," thus potentially giving rise to conflicting claims by different states.  *Id*.  The Supreme Court recognized long ago that "[s]ince choses in action have no spatial or tangible existence, control over them can 'only arise from control or power over the persons whose relationships are the source of the rights and obligations.'"  *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 439 (1951) (quoting *Estin v. Estin*, 334 U.S. 541, 548 (1948)).   "The rights of the owners of the [property] come within the reach of the court by the notice."  *Id*. at 440.

The Supreme Court recognized that the rights to which the states could take custody were derivative of the rights of the true owners:

> "Such rights are but relationships between persons, natural or corporate, which the law recognizes by attaching to them certain sanctions enforceable in courts. The power of government over them and the protection which it gives them cannot be exerted through control of a physical thing. They can be made effective only through control over and protection afforded to those persons whose relationships are the origin of the rights."

*Id.* at 439 n.12 (quoting *Curry v. McCanless*, 307 U.S. 357, 365-366 (1939)); *see also* Houghton, *et al.*, *Unclaimed Property*, 74-3rd C.P.S. at A-23 (BNA 2014) ("The state's rights to the property are, thus, 'derivative' in nature (*i.e.*, the property rights of the owner transition to the state))."

In *Western Union Telegraph Co. v. Pennsylvania*, 368 U.S. 71 (1961), the Supreme Court reversed a Pennsylvania state court judgment requiring Western Union to escheat unclaimed money orders to Pennsylvania that were sold in that state. *Id.* at 73-74. The Supreme Court held that Western Union's substantive due process rights would be violated if it was required to escheat the unclaimed money orders to Pennsylvania, because Pennsylvania courts lacked jurisdiction over other states and the true owners of the money orders, any of whom may also claim the property, thereby exposing Western Union to potential multiple claims and liability. *Id.* at 75. Therefore, in *Texas*, the Supreme Court exercised its original jurisdiction over disputes between states to allow Texas to file a complaint against

New Jersey and Sun Oil Company to resolve the states' conflicting claims to the intangible unclaimed property on Sun Oil Company's books and records, and did so by establishing a federal common law governing a state's authority to escheat intangible unclaimed property. *Texas*, 379 U.S. at 676-77.

The federal common law is referred to commonly as the "priority rules." The threshold step in applying the priority rules is, consistent with the derivative rights doctrine, to identify the intangible property interest at issue (*i.e.*, to "determine the precise debtor-creditor relationship as defined by the law that creates the property at issue."), which also identifies the debtor and creditor. *See Delaware*, 507 U.S. at 499. The "primary rule" then gives the opportunity to escheat to the state of the creditor's last known address as shown on the debtor's books and records. *Id.* at 499. If the primary rule fails because the debtor's books and records lack an address for the owner, or if the state of the owner's address does not provide for escheat, the "secondary rule" awards the property to the holder's state of incorporation. *Id.* at 500.

The priority rules preempt the UPA. "States can no more override [federal] judicial rules validly fashioned than they can override Acts of Congress."[1]   *Am.*

---

[1] This District has rejected the notion that the *Texas* Cases apply only to conflicts between states: "It is true that the Supreme Court's original jurisdiction was premised on the dispute between state parties, but to say that the Court's substantive decision is limited to state parties confuses jurisdiction with merits." *American Express Travel Related Services Inc. v. Sidamon-Eristoff*, 755 F.Supp. F.

*Petrofina Co. of Texas v. Nance*, 859 F.2d 840, 842 (10th Cir. 1988) (internal citations omitted).

The Assessments include amounts that New Jersey cannot claim under the priority rules because other states have jurisdiction over the property under the primary rule. The Other States Assessment is comprised entirely of unclaimed disbursements where the owners have U.S. addresses outside New Jersey. $11,192.62 of that assessment relates to property over which other states with jurisdiction under the primary rule exempt such property from the reporting requirement (Illinois, Indiana, Maryland, Ohio and Virginia) and $1,497.37 relates to states whose laws toll the dormancy period during a continuing business relationship and thus was not dormant (Arizona and Tennessee).[2] The Disbursements Assessment and the Credit Assessment[3] include identifiable property where the owners have U.S. addresses outside of New Jersey. $21,225.56 of the Disbursements Assessment and a portion of the Credits Assessment relate to property of owners in states that exempt such property from

---

2d 556, 608 (D.N.J. 2011)(noting that Sun Oil was a party to the lawsuit in *Texas*, as was Western Union in *Pennsylvania*).

[2] *See* 765 ILCS § 1025/2a (exemption); Ind. Code § 32-34-1-1(e) (exemption for credits); Md. Code Ann. Com. Law § 17-101(m)(3) & (4) (exemption); Ohio Rev. Code Ann. § 169.01(B)(2)(b) (exemption); Va. Code Ann. § 55-210.8:1.B (exemption); Ariz. Rev. Stat. § 44-301.15 (tolling); Tenn. Code Ann. § 66-29-104(3)(C) (tolling).

[3] As discussed in Part III.B.2, *infra*, the Credit Assessment is comprised entirely of property that is not subject to escheat at all.

the reporting requirement.   Although Defendants may assert that they can claim such property under the second prong of the secondary rule (*i.e.*, where a state does not provide for escheat), they read that prong too broadly.   When the Supreme Court first established the federal common law in *Texas*, few states had enacted general escheat laws.[4]   In addition, "the ability to escheat necessarily entails the ability not to escheat."   *New Jersey Retailer Merchants Ass'n*, 669 F.3d at 395.   The Supreme Court recognized that "[v]arious considerations might motivate states not to exercise custodial escheat."   *Id.*   Further, "[w]hen fashioning the priority rules, the Supreme court did not intend . . . [to] give states the right to override other states' sovereign decisions regarding the exercise of custodial escheat."   *Id.*

Because portions of the Assessments and all of the Other States Disbursements Assessment are subject to escheat laws of other states under the primary rule, enforcement of the Assessments would violate federal common law, which preempts the UPA.   Plaintiff has established a likelihood of success on the merits of its federal common law preemption claim.

---

[4] Before the adoption of the first uniform unclaimed property act, only ten states had comprehensive unclaimed property laws:  Arkansas, Connecticut, Kentucky, Massachusetts, Michigan, New Jersey, New York, North Carolina, Oregon and Pennsylvania.   *See* Houghton, et al., *Unclaimed Property*, 74-3 C.P.S. at A-5, § II.B.1. (BNA 2014).   Today, all 50 states and the District of Columbia have general escheat laws.  *New Jersey Retail Merchants Ass'n*, 669 F.3d at 383.

2.   **The Interstate Commerce Commission Termination Act of 1995 Preempts The UPA And Bars Enforcement Of The Credits Assessment.**

The Credits Assessment is comprised entirely of credits arising from the transportation of property by a motor carrier which is governed by the ICCA. The applicable preemptive federal statutes are 49 U.S.C. §§ 14501 and 41713 (the "Carrier Preemption Statutes"). Section 14501(c)(1) provides that "a State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). As discussed below, Defendants' enforcement of the UPA with respect to customer credits is preempted by the Carrier Preemption Statutes.

The Interstate Commerce Act was passed in 1887 to regulate railroad transportation. *ICU Investigations, Inc. v. Simonik Moving & Storage, Inc.,* 2009 WL 2475225, at *4 (N.J. Super. App. Div. Aug. 14, 2009) (citing *Grafton & Upton R.R. Co. v. Town of Milford*, 337 F.Supp. 2d 233, 237 (D. Mass. 2004)). In 1935, Congress broadened the scope of the statute when it passed the Motor Carrier Act, which placed highway motor carriers under its jurisdiction. *Id.*

Congress began deregulating common carriers in the 1970s. *See* Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. §§ 801-856; and Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. §§ 1301-1557. The ADA included a specific preemption provision prohibiting the states from enacting or

19

enforcing "any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier...." 49 U.S.C. § 1305(a)(1).  Trucking was deregulated pursuant to the Motor Carrier Act of 1980.  *See Rowe v. N.H. Motor Transport Ass'n*, 552 U.S. 364, 368 (2008). Congress preempted state trucking regulation by enacting the Federal Aviation Administration Authorization Act of 1994 (FAAAA) and borrowed the preemption language from the ADA, applying it to combined motor-air carriers in the FAAAA. *See id.*; *see also* 49 U.S.C. § 41713(b)(4)(A).

In 1995, Congress enacted ICCA, which abolished the ICC and transferred its rail and non-rail regulation functions to the newly-created Surface Transportation Board within the Department of Transportation.  49 U.S.C. §§ 701-727; *id.* §§ 10101-16106.   As in the FAAAA, Congress also used the preemption language of the ADA in § 14501(c)(1) of the ICCA.

The Supreme Court has broadly construed the Carrier Preemption Statutes. In *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), the Supreme Court interpreted language in the ADA identical to the ICCA, to preempt state law claims alleging deceptive advertising relating to air fares.  The Supreme Court held that any state law or action that has any "connection with or reference to" carrier rates or prices is preempted.  *Id.* at 384.  The Court held that state law was preempted even if the effect on price, route or service was indirect and irrespective of whether

20

the state law was inconsistent with federal regulation.  *Id.* at 386-87.  The Court interpreted the phrase "relating to" broadly to mean "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into associate with or connection with'."  *Morales*, 504 U.S. at 383 (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)).  The Court held that state law is preempted, even though it does not actually regulate price, route or service, as long as it impacts Congress' deregulatory objectives.   Laws of general applicability, and not just those addressed to the airline industry, are preempted if they have anything more than a "tenuous, remote, or peripheral" effect on rates, routes or services.  *Id.* at 386-90.

The expansive preemptive reach of the Carrier Preemption Statutes as construed by *Morales*, is depicted in the preemption of a wide variety of state statutory and common law claims.  For example, in *Witty v. Delta Air Lines, Inc.*, the Fifth Circuit rejected a state law tort claim seeking damages for a medical condition (known as Deep Vein Thrombosis) that allegedly resulted from excessive crowding on Delta's passenger aircraft.  366 F.3d 380 (5th Cir. 2004).  In ruling that this claim was preempted by the ADA, the Court reasoned that in the absence of such preemption, Delta would be required to reduce the number of seats on the aircraft, which would cause Delta to increase prices charged for the remaining seats in order to maintain profit levels.  *Id.* at 383.  Further, "[w]hile the

state regulation of leg room might not relate to prices as obviously as the state regulation of fare advertising at issue in *Morales*, the economic effect on prices would in our view be significant." *Id.*

In *UPS, Inc. v. Flores-Galarza*, 318 F.3d 323 (1st Cir. 2003), UPS asserted that a Puerto Rico law was preempted by the FAAA and the ADA where the law prohibited interstate carriers from making deliveries without proof that either (a) the recipient had paid a territorial excise tax, or (b) the carrier complied with a complex alternative procedure for documenting the carrier's reimbursable payment of the tax. *See id.* at 325-27. The First Circuit agreed with UPS and specifically rejected the argument that preemption applies only to statutes that "seek to set, control or manipulate" prices, routes, or services. *Id.* at 335. The Court emphasized that a broad preemptive interpretation "is consistent with the purpose animating the [FAAAA] and [ADA], which sought to prevent states from interfering with the goal of federal deregulation of air transportation. . . ." *Id.* The court further found that compliance with Puerto Rico's law "imposes extensive requirements that must be met before a carrier may make a lawful delivery. These requirements create a substantial burden on UPS, in the form of additional labor, costs, and delays . . . . The costs of this scheme necessarily have a negative effect on UPS's prices." *Id.* at 336. Because the law impacted a carrier's costs, the court found that the law related to rates and was preempted. *Id.*

In *New England Legal Found. v. Mass. Port Authority*, the court upheld a finding by the United States Department of Transportation ("USDOT") that a restructuring of airport landing fees by the Massachusetts Port Authority ("Massport") was preempted by the ADA, despite a savings clause that allows a state "as the owner or operator of an airport . . . to exercise its proprietary powers and rights."    883 F.2d 157, 171 n.24, 172 (5th Cir. 1989).   Agreeing with the USDOT finding that Massport's new landing fee structure was preempted due to its significant economic impact on small-carrier access to the state's major airport, the court stated: "In reducing federal economic regulation of the field to allow the forces of free competition to rule the marketplace, Congress obviously did not intend to leave a vacuum to be filled by the Balkanizing forces of state and local regulation." *Id.* at 173.   Thus, the Court expressed the ADA's well-recognized purpose of deregulating airlines to avoid the disparate impact of varying state laws on carrier prices.   This purpose applies with equal force to application of the widely varying state unclaimed property laws to Plaintiff's customers credits.

It is also well-settled that the Carrier Preemption Statutes include within their preemptive scope traditional state law claims that relate to a carrier's rates.   In *Statland v. Amer. Airlines, Inc.,* the Seventh Circuit held that the plaintiffs' challenge to an airline's refund policy was expressly preempted under the ADA, even though the state law claims were based on laws of general applicability (*e.g.,*

23

breach of fiduciary duty, breach of contract, and conversion).  998 F.2d 539, 541-42 (7th Cir.  1993).  The court found that while a refund policy is not a rate policy, the plaintiffs' claims were preempted under *Morales* because a refund policy relates to rates.  *Id.* at 542.

Similarly in *Vail v. Pan Am Corp.*, the plaintiffs sued Pan Am for fraud and breach of contract, alleging that the airline failed to implement an enhanced security program.  616 A.2d 523 (N.J. Sup. Ct. 1992). The New Jersey Appellate Division held that the plaintiffs' claims were preempted under the ADA because the claims related to the airline's rates.   The court acknowledged that implementation of a security program may not directly relate to rates, but because the airline purportedly charged more per ticket to defray the cost of the program, the court found that the plaintiffs' claim "indirectly relate[d] to the 'rates' charged. . . ." *Id.*  at 526.  The state court found the claims to be expressly preempted because they indirectly related to the carrier's rates and service.  *Id.* at 527; *see also Illinois Corporate Travel, Inc. v. American Airlines, Inc.*, 889 F.2d 751 (7th Cir.  1989) (finding that travel agency's state law claims against airline based on refusal to issue tickets to agency were preempted).

In 2008, the Supreme Court once again broadly interpreted the Carrier Preemption Statute, concluding that it preempted a Maine statute.  In *Rowe v. N. H.*

*Motor Transport Ass'n*, the Court affirmed its holding in *Morales* summarizing it

as follows:

> In *Morales*, the Court determined:   (1) that "[s]tate enforcement
> actions *having a connection with, or reference to*" carrier "'rates,
> routes, or services' are pre-empted," . . . (2) that such pre-emption
> may occur even if a state law's effect on rates, routes or services "is
> only indirect," . . . (3) that, in respect to pre-emption, it makes no
> difference whether a state law is "consistent" or "inconsistent" with
> federal regulation . . . and (4) that pre-emption occurs at least where
> state laws have a "significant impact" related to Congress'
> deregulatory and pre-emption-related objectives . . ."

552 U.S. at 370-71 (emphasis in original) (internal citations omitted).  There, the

Maine statute forbid tobacco retailers to employ a "delivery service" that did not

follow specified procedures, including, *inter alia*, verifying that the person who

purchased the tobacco is the person to whom it was addressed and that the

recipient was of legal age.  *Id.* at 368, 371.  The Supreme Court held that although

the statute targeted tobacco retailers, because it focused on trucking and other

motor carrier services, it had a direct connection to motor carrier services.  *Id.* at

371.   The effect on such services was adverse because it required carriers to

provide verification services that they might prefer not to offer.  *Id.* at 371-72.  The

Court stated that "[t]he Maine law thereby produces the very effect that the federal

law sought to avoid, namely a State's direct substitution of its own governmental

commands for 'competitive market forces' in determining . . . the services that

motor carriers will provide."  *Id.* at 372.  Further, the statute imposed civil liability

upon the carrier effectively for failing to sufficiently examine every package it was delivering to determine whether it contained tobacco products, thereby directly regulating carriers' delivery services. *Id.* at 372-73. Significantly, the Court held that "[t]o allow Maine to insist that the carriers provide a special checking system would allow other States to do the same." *Id.* at 373. The patchwork of state laws that might result "is inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Id.*

In an unpublished case, the New Jersey Appellate Division relied on *Morales* and *New Hampshire Motor Transport Association* when holding that the ICCA preempted state consumer fraud claims against a motor carrier under the New Jersey statute rejecting the state law's effect on public welfare and the plaintiff's assertion that preemption would deprive it of a remedy. *ICU Investigations,* 2009 WL 2475225, at *8. The Appellate Division rejected the plaintiff's "narrow interpretation of Section 14501 as preempting the states, solely, from prescribing rates, routes, and service" finding that interpretation "would fly in the face of the broad interpretation the Supreme Court gave in those cases to the 'relating to' language of the preemption statutes." *Id.*

The Appellate Division rejected the plaintiff's assertion that preemption would run counter to the public welfare purpose of the consumer fraud statutes. It stated that "[d]espite the public welfare considerations and salutary purpose of the

[consumer fraud statute], we cannot agree with ICU that federal law creates an exception on that basis to exempt state laws it would otherwise preempt." *Id.* at *9. When the plaintiff complained that it would be without a remedy if federal law preempted its claims, the Appellate Division responded by stating that the possibility that the plaintiff might lack a remedy because of preemption was actually consistent with the pre-emption doctrine. *Id.* "'[I]t merely shows that Congress has weighed the matter and struck the balance in defendant's favor.'" *Id.* (quoting *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 869 F.Supp. 278, 288 (D.N.J. 1994)).

Here, while Defendants may argue similarly that exempting customer credits from escheat deprives New Jersey citizens of funds and/or efforts to reunite property with owners, Congress has "weighed the matter and struck a balance" in Plaintiff's favor. The "P" credits all arise in connection with the transportation of property by a motor carrier. They are generated, *inter alia*, when a payment received cannot be matched to a an open invoice, such as when customers pay based on their record of contracted tariff rates, bills of lading, and other shipping related documentation even before Plaintiff issues an invoice. If P credits are subject to escheat it affects Plaintiff's refund policies concerning credits. Although the UPA is not targeted specifically at carriers, New Jersey is attempting to apply those laws to require Plaintiff to alter its refund policy concerning customer credits

27

of a carrier as in *Stratland,* 998 F.2d at 542. Further, as in *New Hampshire Motor Transport* Association, 552 U.S. at 371-72, Plaintiff's practices for refunding customer credits would be affected by the UPA, rather than by the marketplace. If Defendants can enforce the Credits Assessment against Plaintiff, then all states could do so in their patchwork of unclaimed property statutes, each with differing due diligence requirements, reporting deadlines and exemptions. The Supreme Court found state statutes preempted under similar circumstances in *Flores-Galarza*, 883 F.2d at 173, and *New Hampshire Motor Transport Association*, 552 U.S. at 373.

In addition, § 46:30B-50 of the UPA requires Plaintiff to send by certified mail due diligence notices to each customer with a credit outstanding 3 years, which would place a significant administrative burden on Plaintiff. *See* N.J.S.A. § 46:30B-50. The additional administrative costs of complying with the UPA will be a significant impact on services, carrier rates and financial condition due to lost revenue. Application of the UPA to Plaintiff's customer credits would necessarily impact Plaintiff's rates in more than a "tenuous, remote, or peripheral" way. To defray the costs of complying with the UPA, Plaintiff would have to increase rates. The impact of such a result will fall more directly on prices than many of the practices at issue in the various preemption cases discussed above, including *Morales.*

28

For all of the foregoing reasons, Plaintiff has established a likelihood of success on the merits of its claims that the ICCA preempts the UPA with respect to P credits.

### 3.    The Assessments Violate The Commerce Clause.

Under the Commerce Clause of the U.S. Constitution, Congress has the authority to "regulate Commerce . . . among the several States." *See* U.S. CONST. art. 1, § 8, cl. 3.  State action that purposefully or arbitrarily undermines uniformity in areas of particular federal importance is given heightened scrutiny.  *Old Bridge Chems., Inc. v. N.J. Dept. of Envtl. Protection,* 965 F.2d 1287, 1291 (3d. Cir. 1992)

"The [Commerce] Clause permits Congress to legislate when it perceives that the national welfare is not furthered by the independent actions of the States." *See Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 669 (1981).  The ICCA's well-recognized purpose of deregulating motor carriers is demonstrated by the breadth and reach of the Carrier Preemption Statutes, as discussed in Part III.B.2, *supra* (which is incorporated herein by reference).

The broad Carrier Preemption Statutes demonstrate the federal importance in uniformity and thus the UPA should be subject to heightened scrutiny.  *Old Bridge Chemicals, Inc.*, 965 F.2d at 1292.   But even under a balancing test, the federal importance trumps New Jersey's local interests.  The policy underlying the UPA is to reunite property with its owners, primarily with addresses in New Jersey, and to

29

permit the citizens of New Jersey to benefit from the use of such funds until the

owners are found, rather than to benefit individual holders.  *See N.J. Retail*

*Merchants Ass'n.*, 669 F.3d at 397.  That purely local policy does not overcome the

strong federal interest in uniformity of deregulation of motor carriers with respect

to price, route and services operating in interstate commerce.  *See e.g., Flores*

*Galarzo*, 318 F.3d at 335.

Defendants' actions may affect a significant amount of commerce.  In 2012

alone, the transportation industry generated $1.22 trillion in spending and

represented 8.5% of annual gross domestic product ("GDP").  *See* Select USA,

*Logistics and Transportation Industry in the United States*, available at

http://selectusa.commerce.gov/industry-snapshots.  Defendants' enforcement of the

UPA to require that motor carriers escheat credits would extend equally to credits

held by airlines and railroads and has the potential to impact millions, if not

billions, of dollars of spending affecting interstate commerce.

In addition, the sovereign right of a state to escheat includes the right not to

escheat.  Defendants' assessments against Plaintiff for property exempted from

escheat under a first priority rule state's B2B exemption and property that pursuant

to the primary rule state is not dormant infringes on the states' sovereignty and

undermines their efforts to attract business by creating a business friendly

environment, thereby interfering with and burdening commerce in those states in

violation of the Commerce Clause. For all the foregoing reasons, Plaintiff has established a likelihood of success on the merits of its Commerce Clause claim.

### 4. The Assessments Violate New Jersey's Unclaimed Property Law.

New Jersey regulates the reporting and collection of unclaimed property pursuant to the UPA, N.J.S.A. §46:30B-1, *et. seq*. The UPA was modeled after the 1981 Uniform Disposition of Unclaimed Property Act (the "1981 Uniform Act"), but was amended prospectively effective July 1, 2002 to adopt the 1995 Uniform Disposition of Unclaimed Property Act (the "1995 Uniform Act") with some modifications. *See generally* New Jersey Law Revision Commission, Final Report relating to Uniform Unclaimed Property Act (June 1998).

The UPA requires a holder to report and pay to the State before November 1st of each year any property that has become abandoned as of the preceding June 30th. N.J. Stat. Ann.§ 46:30B-49. The Administrator may examine the records of any person to determine whether the person has complied with the UPA. *Id.* § 46:30B-91.

Prior to June 30, 2002, holders were required to "maintain a record of the name and last known address of the owner for five years after the property becomes *reportable*." *See* § 46:30B-95, L. 1989, c. 58, s 1 (amended by L. 2002, c. 35, s 62, eff. July 1, 2002) (emphasis added). Property arising in 1991 was

reportable in 1996[5] and thus records were no longer subject to retention after 2001.   Effective July 1, 2002, § 46:30B-95 was amended to require holders prospectively to "maintain a record of the name and last known address of the owner for five years after the holder *files the report*."  (emphasis added).

If a holder lacked records as required by § 46:30B-95, § 46:30B-94 of the UPA provided:

> If, after the effective date of P.L. 2002, c. 35 [July 1, 2002], a holder does not maintain the records required by R.S. 46:30B-95 . . . the administrator may require the holder to report and pay to the administrator the amount the administrator reasonably estimates, on the basis of any available records of the holder or by any other reasonable means of estimation acceptable to the administrator, that should have been but was not reported.

Section 46:30B-94 was modeled after § 20(f) of the 1995 Uniform Act.  *See* New Jersey Law Revision Commission, Final Report relating to Uniform Unclaimed Property Act, at p. 23 (June 1998). .

A comment to § 20(f) of the 1995 Uniform Act recognizes this as a penalty provision that is only applicable prospectively:

> Subsection (f) permits the use of estimates in instances where the holder has failed to report and deliver property that is abandoned and no longer has reasonably accessible records sufficient to prepare a specific report. . . .   While the holding in *Texas v. New Jersey* is intended to prevent multiple liabilities of holders, this subsection, *viewed as a penalty*, for failure to maintain records of names and last

---

[5] The dormancy period for non-payroll property was 5 years until shortened effective July 1, 2002. *See* L. 1989, c. 58, s 1 (amended by L. 2002, c. 35, s 4 (eff. July 1, 2002).

known address, is not inconsistent with that decision.  That part of subsection (f) which permits the State to make estimates **was prospective only** from the date of adoption . . ..

Uniform Unclaimed Property Act § 20(f) cmt. (1995) (emphasis added).

Defendants violated § 46:30B-94  and § 46:30B-95 by (1) applying the law in effect after July 1, 2002 retroactively[6] and (2) violating the reasonableness standard, disregarding records that were available, and extrapolating amounts that were not reportable to New Jersey, including amounts that were not reportable at all.[7]

Instead of basing the penalties on estimates of unclaimed property that Plaintiff should have reported but failed to report to New Jersey under federal common law -- *i.e.*, property where the owner's address was in New Jersey, a foreign country, or lacked an address -- Defendants estimated unclaimed

---

[6] In addition, prior to July 1, 2002, the Unclaimed Property Act prohibited the Administrator from bringing an action or proceeding to enforce the Unclaimed Property Act "more than 10 years after the duty arose."  N.J. Stat. Ann. § 46:30B-89.  Effective July 1, 2002, Section 46:30B-89 was amended to bar the Administrator from bringing an action or proceeding more than 10 years after a "holder specifically identified the property in a report filed with the administrator." Amended § 46:30B-89 was made effective on July 1, 2002, after the statute of limitations applicable to 1991 had already expired.

[7]  Further, the only New Jersey escheat case permitting estimation where records no longer existed required the methodology to satisfy evidence rules applicable to expert witnesses and stating that "a court should not base an opinion on theories of value that lack support in the record, demonstrated market reliability, or general acceptance." *See e.g., New Jersey v. Chubb*, 570 A.2d 1313, 1317 (N.J. Super. 1989) ( (quoting *Bowen v. Bowen*, 473 A.2d 73 (N.J. 1984)).

disbursements and credits where the owners had addresses in other states, including states that exempted such property from the reporting requirement under a B2B exemption and property that was not dormant under primary rule states' laws that tolled the dormancy period during a continuing business relationship.

Section 46:30B-94 in effect prior to July 1, 2002 authorized an estimation penalty only if Plaintiff failed to comply with the document retention requirement in § 46:30B-95 in effect at that time. Under that statute, Plaintiff was no longer required to retain records applicable to 1991 because that records retention statute required Plaintiff to "maintain a record of the name and last known address of the owner for five years after the property becomes *reportable*." *See* N.J.S.A. § 46:30B-95, L. 1989, c.58, s 1 (amended by L. 2002, c. 35, s 62, eff. July 1, 2002) (emphasis added). Amended § 46:30B-94 is expressly applicable prospectively only to failures to retain records under amended § 46:30B-95 *after* July 1, 2002: "If, after the effective date of P.L. 2002, c. 35 [July 1, 2002], a holder does not maintain the records required by R.S. 46:30B-95 . . .." Defendants cannot retroactively apply a penalty against Plaintiff to conduct that was lawful at the time. Plaintiff was permitted to discard records for 1991 before July 1, 2002, and therefore Defendants cannot assess the penalty in amended § 46:30B-94 based on a new record retention statute. Nevertheless, Defendants calculated penalties for 1991 with respect to both disbursements and credits.

Defendants also violated § 46:30B-103. If a holder fails to deliver unclaimed property to the State by the deadline for filing a report, § 46:30B-103 authorizes the assessment of interest "on the property or value thereof from the date the property should have been paid or delivered." N.J.S.A. § 46:30B-103. However, Defendants assessed interest on the penalties calculated pursuant to § 46:30B-94 as well. Plaintiff has established a likelihood of success on the merits of its claims under the UPA.

### C.   Plaintiff Has Established That It Will Be Irreparably Harmed If Preliminary Injunctive Relief Does Not Issue

A preliminary injunction is properly granted if Plaintiff can prove that there is a serious risk that it will suffer actual, immediate irreparable injury absent such relief. "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 485-86 (3d Cir. 2000).

Plaintiff has established irreparable harm where, as here, Plaintiff "must either face prosecution and fines for noncompliance or turn over, in cash," the amount of the Assessments. *See N. J. Retail Merchants Ass'n,* 669 F.3d at 388. *In New Jersey Retail Merchants Association*, the Third Circuit affirmed a preliminary injunction enjoining enforcement of an amendment to New Jersey's escheat law, finding that the plaintiff retailers would be irreparably harmed because the retailers

35

would have to turn over, in cash, the amount of unredeemed gift cards or face fines and prosecution for noncompliance. *Id.* The Third Circuit stated that the retailers could not receive a refund of those funds if the unclaimed property law was later found to be unconstitutional, due to state sovereign immunity. *Id.* (*citing Edelman v. Jordan*, 415 U.S. 651, 663 (1974)) ("'[S]uit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment')"). *See also Capogrosso v. Supreme Court of New Jersey*, 588 F.3d 180, 185 (3d Cir. 2009).

Here, Plaintiff faces potential enforcement action if it fails to make payment in the amount of $1,954,506.31 by June 1, 2015 and Defendants have threatened to charge interest at the rate of 10% above the U.S. Treasury rate, which compared to the interest rates on commercial loans in today's market is akin to a penalty. Further, Plaintiff faces potential enforcement action if it fails to make payment of any of the Assessments. Yet, Defendants would be immune from any suit for damages for funds improperly paid by Plaintiff, even if later found to be invalid or unconstitutional. Because New Jersey would be immune from any suit seeking damages for funds improperly paid by the Plaintiff, even if later found to be invalid or unconstitutional; Plaintiff would not be able to recoup funds paid pursuant to the Assessments, and clearly face irreparable harm.

36

As such, it is clear that Plaintiff faces irreparable harm should an injunction not issue, and Plaintiff's requested relief should be granted.

**D.     A Balancing Of The Harms Favors Granting A Preliminary Injunction**

The Court must also weigh the balancing of the harms of the parties.  The State will not be harmed by the granting of preliminary injunctive relief because Plaintiff merely seeks to maintain the status quo until a decision on the merits can be made.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Southco, Inc. v. Kanebridge Corp.*, 324 F.3d 190, 195 (2003), *rev'd en banc on other grounds*, 390 F.3d 276 (3d Cir. 2004) (citation omitted).  *See also, Telebrands Direct Response Corp. v. Ovations Communications, Inc.*, 802 F.Supp 1169, 1175 (D.N.J. 1992)(holding that "the primary purpose of a preliminary injunction is to preserve the status quo ...")

In *New Jersey Retail Merchants Association*, the Third Circuit found that a balance of the harms favored granting the retailer plaintiffs preliminary injunctive relief to preserve the status quo until the validity of the New Jersey escheat law could be decided on the merits.  The court stated that "[g]ranting the preliminary injunction would not result in a greater harm to the State because the State 'does not have an interest in the enforcement of an unconstitutional law[.]'"  669 F.3d at

37

388-89.   Similarly here, Defendants do not have an interest in enforcement of conduct that violates the ICCA Preemption Statutes, federal common law and is unconstitutional.   Plaintiff seeks nothing more than to maintain the status quo pending the final outcome of the case.   Thus, preliminary injunctive relief is appropriate in this case and should be granted.

### E.   Preliminary Injunctive Relief Is In The Public Interest

Finally, a preliminary injunction is properly granted where, as here, the requested relief is in the public interest. *Id.* at 389.   Here, it is clearly in the public interest to maintain the status quo pending a decision on the merits of the litigation. In *New Jersey Retail Merchants Association,* the Third Circuit affirmed entry of preliminary injunctive relief under similar circumstances, stating that "granting preliminary injunction would be in the public's interest ...because 'the public interest [is] not served by the enforcement of an unconstitutional law.'" *Id.* (*citing Am. Civil Liberties Union v. Ashcroft,* 322 F.3d 240, 247 (3d Cir. 2003)).   The same circumstance applies here.   Therefore, preliminary injunctive relief should be granted.

## IV.   **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that this Court enter a preliminary injunctive enjoining Defendants from enforcing the

Assessments and/or additional interest and/or penalties until a decision on the merits of Plaintiff's claims has been made.

**REED SMITH LLP**
Attorneys for Plaintiff

Kellie A. Lavery
Princeton Forrestal Village
136 Main Street – Suite 250
Princeton, NJ 08540-7839
(609) 987 0050

**REED SMITH LLP**
Diane Green-Kelly
10 S. Wacker Drive, 40th Floor
Chicago, Illinois 60606
(312) 207 1000

Dated: May 27, 2015